UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
************************************************************************

**JOSEPH PAUL GUARNERI,**

                **Plaintiff,**

        **vs.**                                  **9:06-CV-985**
                                                  **(NAM/DRH)**

**LT. JAMES HAZZARD, CORPORAL J. CROOK,**
**DEPUTY PAUL MARCH; DEPUTY GRIPPIN,**
**DEPUTY HOWLAND, DEPUTY MACE, DEPUTY**
**JOHN DOE, THE SCHOHARIE COUNTY JAIL**
**MEDICAL DEPARTMENT, DR. WEITZ, JANE DOE**
**NURSE PRACTITIONER, COMMISSIONER**
**FREDERICK C. LAMY, AND FRANCIS T. SULLIVAN,**

                **Defendants.**

************************************************************************

APPEARANCES:                           OF COUNSEL:

Joseph Paul Guarneri
05-B-0213
Schoharie County Jail
157 Depot Lane
P.O. Box 689
Schoharie, New York 12157
*Plaintiff Pro Se*

O'Connor, O'Connor, Bresee & First, P.C.     Justin O'C. Corcoran, Esq.
20 Corporate Woods Boulevard
Albany, New York 12211
*Attorneys for Defendant Weitz*

Lemire, Johnson Law Firm             Gregg T. Johnson, Esq.
P.O. Box 2485                         Scott Quesnel, Esq.
2534 Route 9
Malta, New York 12020
Attorneys for Defendants
*Lt. James Hazzard, Cpl. J. Cronk, Deputy*
*Paul Marsh, Jr., Deputy Grippin, Deputy*
*Howland, County of Schoharie and Deputy Mace*

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

                **MEMORANDUM-DECISION AND ORDER**

In this *pro se* civil rights action under 42 U.S.C. § 1983, plaintiff claims that defendants violated his First, Eighth and Fourteenth Amendment rights while plaintiff was incarcerated at the Schoharie County Jail.  In the second amended complaint, plaintiff asserts that defendants violated:  (1) the Eighth Amendment for failing to provide plaintiff with adequate medical care; (2) the First Amendment and Religious Freedom Restoration Act ("RFRA") for denying plaintiff the right to practice his chosen religion; (3) the Fourteenth Amendment for denying plaintiff Equal Protection on account of his religious beliefs; and (4) the First Amendment for denying plaintiff access to the courts.  Defendants move for summary judgment and dismissal of plaintiff's second amended complaint pursuant to Fed. R. Civ. P. 56.

## FACTUAL BACKGROUND

The facts in this case, unless otherwise noted, are undisputed.[1]  The Schoharie County Sheriff's Department ("SCSD") operates the Schoharie County Jail Facility ("SCJ") in Schoharie County, New York.  At the relevant time period, James Hazzard ("Lt. Hazzard") was employed as a lieutenant in the SCSD.  In 2006, Lt. Hazzard was the Chief Administrative Officer for the SCJ and was responsible for reviewing inmate grievances.   Allen Nelson ("Nelson") was employed by the SCSD as a Corrections Officer and acted as the SCJ Inmate Grievance Coordinator with responsibilities that included receiving, investigation and making determinations on inmate grievances.[2]  Paul Marsh ("Marsh") was employed as a Corrections Officer at SCJ.  However,

---

[1] The facts set forth in this section are taken from: (1) the Second Amended Complaint; (2) the Answer; (3) Defendants' Statements of Material Facts; (4) the exhibits and evidence submitted by Defendants in support of their Motions for Summary Judgment; (5) plaintiff's deposition transcript; and (6) the exhibits and evidence submitted by Plaintiff in Opposition to Defendants' Motion for Summary Judgment.  Plaintiff does not dispute the accuracy of the facts.  In opposition to the motion, plaintiff provided copies of several grievances filed in 2008.  The Court has reviewed those submissions and determines that they are not relevant to the issues at hand and therefore, will not be considered within the context of these motions.

[2] Officer Nelson is not a defendant in this action but provided an affidavit in support of defendants' motion.

Officer Marsh was injured on November 5, 2005 and, as of December 2008, had not returned to work. James Grippin ("Grippin") was employed as a Corrections Officer at SCJ from February 2003 through August 2006. Donald Mace ("Mace") was employed as a Corrections Officer at SCJ and was employed in that capacity for 19 years. Dr. Weitz ("Weitz") is board certified in internal medicine and rheumatology and licensed to practice medicine in the State of New York. Dr. Weitz began working at SCJ in January 2004. Defendant Weitz has submitted a twenty page affidavit which details his contacts with plaintiff and comments on all of plaintiff's visits for sick call.[3] Defendant Weitz's affidavit chronologically details all of the dates and states whether plaintiff was seen by other medical personnel or treated by defendant Weitz.

Plaintiff has been arrested over 70 times in the past 20 years and has spent most of his adult life in and out of correctional facilities on various charges and convictions. Since 2000, plaintiff has been housed at SCJ on 16 separate occasions.[4] Plaintiff claims that he suffers from herniated discs in his neck and lower back, torn ligaments in his knee, post-traumatic stress disorder ("PTSD"), bi-polar disorder and depression.

**Plaintiff's Incarceration from 2004 until 2005**

Plaintiff was incarcerated at SCJ from January 2004 until January 2005. On January 29, 2004, plaintiff was evaluated by a social worker at SCJ. Plaintiff denied suicidal and homicidal ideation and was found not to be an "imminent risk" to himself or others. On February 27, 2004,

---

[3] Defendant Weitz summarizes plaintiff's medical treatment from January 2004 until July 2006. The relevant portions of plaintiff's medical records are sealed medical records on file with the court. As plaintiff has not objected to the admissibility of these records, the Court accepts the medical records as evidence and the statements contained therein as true. *See Jackson v. Onondaga County*, 1998 WL 713453, at *5 (N.D.N.Y. 1998).

[4] Plaintiff was incarcerated at SCJ from 2000 - 2005. However, for the purposes of the within motion, only the relevant dates of his confinement and medical treatment are summarized herein.

a nurse practitioner examined plaintiff and prescribed Flexeril for his back pain.[5]  At plaintiff's

request, the nurse agreed to discuss plaintiff's mental health complaints with Dr. Weitz. On

March 2, 2004, Dr.Weitz evaluated plaintiff's mental health condition and consulted with Kelly

Farnum, N.P., at Schoharie County Mental Health Clinic.[6]  Dr. Weitz and Nurse Farnum

discussed plaintiff's medical condition and agreed that Dr. Weitz would prescribe Prozac and

Depakote.[7]  On March 23, 2004, plaintiff was seen Nurse Farnum upon Dr. Weitz's request.

Nurse Farnum noted that plaintiff was cooperative, his thoughts were organized and goal directed

and plaintiff denied any suicidal or homicidal tendencies.  Nurse Farnum noted that plaintiff's

impulse was "intact during interview" but that his insight and judgment were "poor" and his

intelligence was, "below average".  Nurse Farnum suggested that plaintiff continue with his

current medication.

In April 2004, the medical staff at SCJ noted that plaintiff requested a transfer to "Mercy"

or another "psychiatric hospital".  The staff denied this request concluding that plaintiff had

"adequate care" and that he was "manipulating for psychiatric hospitalization".  In May 2004,

plaintiff demanded to be seen by a psychiatrist.  The medical staff discussed plaintiff's request

with Dr. Weitz and an appointment was made for plaintiff to see Dr. Warren Becker at Schoharie

County Mental Health Clinic.

On May 18, 2004, plaintiff was treated by a nurse practitioner after complaining that he

---

[5] Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary,* 465, 725 (31st ed. 2007).

[6] Kelly Farnum treated plaintiff prior to his incarceration.

[7] Prozac is used in the treatment of depression and obsessive-compulsive disorder. *Id.* at 730, 1562. Depakote is used in the treatment of manic episodes associated with bipolar disorder. *Id.* at 497, 565.

hurt his right knee playing basketball.  The nurse noted that plaintiff's range of motion was intact but his patella was tender.  The nurse diagnosed plaintiff with a right knee strain and prescribed Bextra.[8]

On June 15, 2004, Nurse Practitioner Nancy McDonald at SCJ noted that plaintiff was refusing to take his medication including Bextra, Wellbutrin, Flexeril, Depakote and Amoxicillin.[9]  Plaintiff reported that he did not take his medications because they "masked the problems".

On June 25, 2004, plaintiff was taken to Bassett Hospital with a prescription from Dr. Weitz for x-rays of his cervical spine, thoracic spine and lumbar spine.  The x-rays revealed mild degenerative changes in the lumbar spine.  Plaintiff was advised to avoid playing basketball and other outdoor recreation.

On July 28, 2004, plaintiff was examined by Dr. Warren Becker, a psychiatrist at Schoharie County Mental Health Clinic.[10]  Dr. Becker found that plaintiff did not display any psychiatric disorder that required medication but noted that the medication would make him "feel calmer".  Dr. Becker found plaintiff to be polite and cooperative and did not conclude that he was suffering from PTSD.

On August 24, 2004, plaintiff requested a knee brace so that he could play basketball.  Plaintiff was seen by a nurse practitioner on August 30, 2004 and complained that he "went to

---

[8] Bextra is an anti-inflammatory used for symptomatic treatment of osteoarthritis or rheumatoid arthritis. *Dorland's* at 215, 2048.

[9] Wellbutrin is used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. *Id.* at 265, 2107.

[10] Plaintiff made a request for his own psychiatrist and that request was denied.  Plaintiff did not file a grievance with respect to that denial.

jump up and when he came down, the right knee buckled". Plaintiff was diagnosed with a right knee strain. The nurse practitioner told plaintiff to avoid basketball and ordered a knee brace. On September 27, 2004, plaintiff requested a different knee brace claiming that the neoprene knee brace he was wearing did not allow for the proper lateral movement of his knee. Nurse McDonald advised plaintiff that his brace was sufficient but stated she would discuss the issue with Dr. Weitz. Dr. Weitz stated that plaintiff needed an orthopedic evaluation to determine his need for a brace. Plaintiff was advised that an appointment would be made for a consultation.

On November 4, 2004, plaintiff was examined by Dr. Shep Friedman, an orthopedist at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament ("ACL") tear. Dr. Friedman suggested exercise and possible surgery. Dr. Friedman indicated that a brace was medically necessary and that he would speak with someone at the jail to discuss a more supportive brace that would meet jail guidelines. The medical staff told plaintiff that if the facility paid for the brace, it would become facility property when he was transferred. Sgt. Newman and Sgt. Santoro gave Nurse McDonald permission to purchase the brace.[11]

In December 2004, plaintiff refused to wear a neoprene knee brace. In January 2005, Dr. Friedman re-examined plaintiff and found a normal gait and normal range of motion with some tenderness in the right knee. Dr. Friedman diagnosed plaintiff with a chronic ACL tear and noted that the jail would not permit plaintiff to use a brace with metal stays outside of his cell. Dr. Friedman suggested surgical intervention or conservative measures including physical therapy.

**Plaintiff's Incarceration in 2006**

Plaintiff was incarcerated at SCJ in June 2006 and remained there until August 24, 2006

---

[11] On December 14, 2004, the brace arrived at SCJ but did not comply with the facility's standards.

for a parole violation.[12]  During the three months that he was incarcerated at SCJ in 2006, plaintiff filed 102 separate inmate requests and approximately 12 medical requests.

In June 2006, upon plaintiff's arrival at SCJ, Sgt. Newman noted that plaintiff had an "old black knee brace in his personal property.  Issued a new blue knee brace - must be returned upon release".

**Plaintiff's Medical Treatment - 2006**

On June 9, 2006, plaintiff completed a medical request form complaining of dizziness and insomnia.  The same day, plaintiff was prescribed Prozac.  On June 10, 2006, plaintiff completed another medical request complaining of pain in his right leg.  Plaintiff was seen by a member of the medical staff and prescribed 800 mg of Motrin.

On June 15, 2006, Dr. Weitz examined plaintiff and noted a history of low back pain and degenerative disc disease of his lower spine.  Upon examination, Dr. Weitz found that plaintiff could walk without limping, had no motor sensory loss and no symptoms with straight leg raises. Dr. Weitz diagnosed plaintiff with low back pain and prescribed Flexeril.  On the same day, plaintiff completed a medical request asking for medication called "trigosamine", a consultation with a neurosurgeon, a back brace and back surgery.  Plaintiff also refused to see Dr. Weitz. Plaintiff was seen by Melissa Becker, a nurse practitioner, who noted that plaintiff's request was for an herbal remedy that was not FDA regulated.  Nurse Becker noted, "I am not ordering unnecessary testing.  I am trained medically to make judgment decisions."

On June 16, 2006, plaintiff submitted a grievance claiming that he was denied a back brace and adequate x-rays for herniated discs.  On June 21, 2006, after an investigation, Officer

---

[12] Defendants allege that plaintiff was admitted on June 7, 2006. Plaintiff claims he was admitted on June 5, 2006.

Nelson concluded that plaintiff was unwilling to follow the course of action recommended by the medical staff and refused to take prescribed medication and Motrin.  Therefore, Officer Nelson responded to the grievance stating, "I have no choice but to deny this grievance".  Plaintiff appealed the decision to Lt. Hazzard who found that, "[y]ou again are refusing any course of action by medical.   They have a plan set up which they discuss with you and you refuse to abide by it.  Grievance denied".  Plaintiff appealed Lt. Hazzard's decision to the Citizens Policy and Complaint Review Council ("CPCRC") and on August 10, 2006, CPCRC issued a decision denying plaintiff's grievance.

On June 18, 2006, plaintiff complained of severe pain in his lower back.  Plaintiff was treated on June 19, 2006 and advised to continue with his medications.  On July 19, 2006, plaintiff requested a hinged knee brace.  On July 20, 2006, plaintiff's medications were increased.

On July 21, 2006, at approximately 2:00 a.m., plaintiff allegedly sustained a knee injury when his knee, "gave out" while he was in the medical holding cell.[13]  Officer Nelson claims that he went to plaintiff's cell at approximately 3:00 a.m. and that plaintiff demanded to be taken to the emergency room immediately and refused to wear his knee brace.  Officer Nelson claims that at approximately 3:12 a.m., he spoke with Dr. Weitz by telephone who directed Officer Nelson to put the brace on plaintiff's knee for the rest of the evening.  Dr. Weitz further advised Officer Nelson that the medical staff would examine plaintiff the next morning at the facility.  Plaintiff claims that he did not put his brace on because his knee "swelled up".

Later the same day, plaintiff was seen by Nurse Becker who noted that plaintiff's knee was tender to the touch with minimal swelling.  Nurse Becker convinced plaintiff to use the brace

---

[13] Plaintiff refers to this incident as the "give way" episode.

but plaintiff insisted that he be taken to the emergency room to be fitted for a metal brace.[14]  The

nurse recommended that plaintiff be evaluated and "scanned".

On July 21, 2006, at approximately 1:45 p.m., plaintiff was seen in the Bassett Hospital

Emergency Room. Plaintiff claims he was in "severe" pain.  The doctors in the emergency room

prescribed Tylenol, wrapped the knee in an ace bandage and advised plaintiff to rest.  The doctors

also suggested that plaintiff follow with Dr. Friedman.  Plaintiff claims he was able to walk out of

the hospital because he was "injected" with pain medication.  Plaintiff testified that within an

hour or two, he was "feeling no pain".  On July 21, 2006, upon plaintiff's return from the

hospital, plaintiff was involved in an incident with the SCJ correctional staff.   Plaintiff admitted

to engaging in a verbal exchange with the staff and also admitted that he kicked one of the

Corrections Officers.[15]

On July 24, 2006, plaintiff was examined by Dr. Friedman at Bassett Hospital.  Dr.

Friedman diagnosed plaintiff with a chronic anterior cruciate ligament tear with some arthritic

change and limited range of motion.  Dr. Friedman noted that plaintiff was fitted for a "Genu

ACL brace" which plaintiff was "comfortable with".

From July 24, 2006 through August 24, 2006, plaintiff was permitted to wear the hinged

knee brace.  On August 24, 2006, Officer Mace escorted plaintiff to the Elmira Correctional

---

[14] Plaintiff claims that he was not examined by any member of SCJ medical staff prior to being seen at the emergency room. Officer Nelson claims that when he advised plaintiff that he would be examined in the morning, plaintiff requested, completed and submitted a Pre-Grievance form. Sgt. Newman claims that he denied the grievance on July 24, 2006 because plaintiff was taken to the hospital on July 21, 2006 and July 24, 2006. Sgt. Newman asserts that plaintiff accepted the decision and that plaintiff took no further action with respect to that grievance.

[15] On August 10, 2006, Sgt. Newman presided over a disciplinary hearing and issued an Inmate Hearing Disposition sanctioning plaintiff to 40 days punitive segregation. Plaintiff was transferred out of SCJ on August 24, 2006 and did not complete his sentence.

Facility ("ECF") and upon arrival, advised ECF staff that the brace needed to be returned to SCJ. The ECF staff removed the brace from plaintiff, outside of Officer Mace's presence.  Officer Mace returned the brace to the SCJ.

**Plaintiff's Request for a Catholic Priest**

On June 9, 2006, plaintiff submitted an Inmate Request seeking "religious assistance" from a Catholic priest.  Plaintiff received a response from Cpl. Rodriguez-Stanley which stated, "I contacted our jail Chaplain Rev. Ferenczy, and he will try to reach the local Catholic priest to see when he could come out and see you".  According to Lt. Hazzard, the SCJ staff, including the facility Chaplain, Reverend Paul Ferenczy, made efforts to obtain the services of a Catholic priest.  Plaintiff testified that he previously met with Rev. Ferenczy.  On June 26, 2006, plaintiff filed a grievance claiming that he was being denied his, "First Amendment of not having his Catholic religion for 'no' reason at all".  Plaintiff claimed that SCJ was deliberately violating the "Religious Freedom Restoration Act".  Plaintiff sought to have "Catholic servicers [sic]".  Lt. Hazzard explained to plaintiff that ongoing efforts were being made to obtain the services of a Catholic priest.  According to Lt. Hazzard, plaintiff accepted that explanation.  On June 29, 2006, plaintiff's request for rosary beads was granted.  In August 2006, Lt. Hazzard denied plaintiff's grievance noting that, "[e]very attempt was made to get [] Catholic priest into facility, our own Chaplain had been trying to assist us.  Inmate was sent back to state on August 24, 2007".[16]

**Plaintiff's Access to Courts**

Plaintiff testified that while incarcerated at SCJ, he filed four lawsuits.  Moreover, his requests for addresses, supplies and a notary were routinely granted.  On June 13, 2006, plaintiff

---

[16] According to the record, plaintiff was transferred to ECF in August 2006.

submitted an Inmate Request seeking, "[l]egal reference material called Chapter on Parole and on Article 78 from the Jailhouse Lawyer Manual New Edition".  On June 15, 2006, plaintiff filed a second Inmate Request with respect to the materials.   On June 16, 2006, plaintiff was advised that the Jailhouse Lawyer Manual, "is not required library material set forth in minimum standards as outline by Commission of Corrections".  On June 16, 2006, plaintiff filed two grievances with regard to this issue.  Plaintiff sought to have all forms and chapters referenced in his prior request provided immediately and sought copies from the Jailhouse Lawyer Manual on Article 78 and parole and all legal forms from that book, "when requested in the future".  Officer Nelson claims that Cpl. Wood investigated the issues and prepared a report.  After reviewing the report, Officer Nelson concluded that SCJ was not required to maintain the requested information.  On June 21, 2006, Officer Nelson issued a decision stating that, "[a]ll legal reference materials required by NYSCOC minimum standards are available for your review in the facility library and case law copies are available, as you well know, by request.  Grievance Denied".  Lt. Hazzard reviewed Officer Nelson's decisions and upheld the denial.  In July 2006, plaintiff made at least three requests for extended library time and all requests were granted. Plaintiff appealed the determination to the CPCRC and on August 10, 2006, the CPCRC denied plaintiff's grievance.

**Prior Litigation**

On May 11, 2005, plaintiff filed an Amended Complaint in an action entitled *Joseph Paul Guarneri v. John Bates, Jr., Lt. Hazzard, Mr. Santoro, Mr. Newman, Roland Hirot, Mr. Gordon, Paul Marsh, Jr., Schoharie County Jail Medical Department, Dr. Weitz, Nancy McDonald, State Commission of Correction, Frederick C. Lamy, Frank T. Sullivan and Eliot Spitzer*, 05-CV-444

(GLS/DRH) (Dkt. No. 5) ("*Guarneri I*").[17]  That action involved plaintiff's medical treatment while he was incarcerated at SCJ from January 2004 until January 2005.  Plaintiff alleged that the defendants violated his right to medical care under the Eighth Amendment.  Specifically, plaintiff alleged that during the course of his arrest on January 5, 2004, he sustained from a rotator cuff tear in his shoulder that caused him severe pain.  Plaintiff claimed that the defendants were deliberately indifferent to his medical needs with regard to the shoulder injury.  Further, plaintiff alleged that he suffered from knee injuries and that the defendants were deliberately indifferent to his needs as they refused to allow plaintiff to wear his hinged knee brace outside his cell.

On May 31, 2007, the defendants filed motions for summary judgment seeking dismissal of plaintiff's complaint. *See Guarneri v. Bates*, 05-CV-444, (Dkt. No. 72).  The matter was referred to U.S. Magistrate Judge David R. Homer for a Report and Recommendation.  In his report, Magistrate Judge Homer provided a factual "Background" that included a discussion of plaintiff's medical treatment from August 2004 through January 2005.  Magistrate Judge Homer found that plaintiff's shoulder injury may constitute a serious medical need, however, plaintiff failed to establish that the defendants were deliberately indifferent. (Dkt. No. 86).  Moreover, Magistrate Judge Homer found that plaintiff failed to offer evidence that his knee injury was serious or that the defendants were deliberately indifferent.  Accordingly Magistrate Judge Homer recommended that the Court grant the defendants' motions for summary judgment and dismissal of all claims. (Dkt. No. 86).

---

[17] Plaintiff's original complaint was filed on April 15, 2005.  On May 3, 2005, Judge Sharpe issued a Decision and Conditional Order of Dismissal directing plaintiff, *inter alia*, "to set forth a short and plain statement of the alleged wrongdoing or misconduct committed by each defendant, the date of the conduct complained of and the nexus between that conduct and plaintiff's constitutional and statutory rights in order that the Court can properly assess the sufficiency of plaintiff's claims." *See Guarneri v. Bates*, 05-CV-444 (Dkt. No. 3).

On March 10, 2008, District Judge Gary L. Sharpe issued a Memorandum-Decision and

Order accepting and adopting Magistrate Judge Homer's Report and Recommendation in its

entirety.  (Dkt. No. 88).

### SECOND AMENDED COMPLAINT AND PROCEDURAL HISTORY

On August 14, 2006, plaintiff filed a complaint in this action.[18]  On February 7, 2007,

plaintiff filed a Second Amended Complaint.  Specifically, plaintiff alleges two causes of action

under the First Amendment: (1) denial of meaningful access to courts; and (2) denial of religious

freedom.  Plaintiff also asserts causes of action with regard to his religious freedom pursuant to

the RFRA and the Fourteenth Amendment.  Plaintiff also alleges that defendants violated the

Eighth Amendment claiming that: (1) defendants did not allow him to keep his hinged knee brace

upon arrival at ECF; (2) defendants delayed in providing adequate emergency treatment in July

2006; (3) plaintiff received inadequate emergency care in 2000 and 2003 for herniated discs; and

(4) defendants denied plaintiff proper medical care by refusing to provide a back brace.

On June 13, 2007, defendant Weitz filed a motion pursuant to Fed. R. Civ. P 12(b)(1) and

12(b)(6) seeking dismissal of plaintiff's complaint arguing that: (1) he was not personally

involved in the deprivation of plaintiff's knee brace and in plaintiff's medical care; (2) the

complaint failed to state a cause of action; (3) the complaint was barred by res judicata and

collateral estoppel; and (4) the claims relating to plaintiff's back were barred by the statute of

limitations. (Dkt. No. 19).   The motion was referred to Magistrate Judge Homer for a Report and

Recommendation.  On February 6, 2008, Magistrate Judge Homer concluded that plaintiff failed

---

[18] On August 14, 2006, plaintiff filed a complaint in this action.  (Dkt. No. 1).  Plaintiff was named as a "co-plaintiff" with another inmate, Ryan McNamee.  On November 9, 2006, this Court issued a Decision and Order severing plaintiff's action from the action of Ryan McNamee and directing plaintiff to file an amended complaint that, "sets forth only his claims for relief and the facts in support of his claims". (Dkt. No. 9).

to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at ECF and recommended granting Weitz's motion for summary judgment based upon lack of personal involvement with the confiscation of the knee brace.  However, Magistrate Judge Homer also found that plaintiff sufficiently alleged that Dr. Weitz was personally involved in his medical care for mental health issues and back and neck injuries sustained in 2003.

Magistrate Judge Homer also found that plaintiff sufficiently alleged an Eighth Amendment violation with respect to his knee injury, mental health and 2003 back injury and recommended denial of Weitz's motion on that ground.[19]  However, plaintiff's claims relating to medical indifference occurring in 2000 were "clearly outside the three-year [statute of limitations] period".  With regard to Weitz's res judicata argument, Magistrate Judge Homer concluded that there had not been a final determination in the pending federal case (09-CV-444) against Dr. Weitz and therefore, that aspect of the motion should be denied without prejudice. On February 27, 2008, this Court adopted Magistrate Judge Homer's Report and Recommendation in its entirety. (Dkt. No. 55).

_____

[19]  In the Conclusion portion of the recommendation, Magistrate Judge Homer did not address defendant's motion with respect to plaintiff's Eighth Amendment claim with regard to his knee injury.  However, in the text of the Report and Recommendation, Judge Homer discussed plaintiff's knee injury.  Judge Homer noted:

> [C]onstruing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.

> Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time . Id. at ¶ 32.

> Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

(Dkt. No. 54).

Presently before the Court are two motions for summary judgment.  Defendant Weitz moves for summary judgment and dismissal of plaintiff's complaint arguing that: (1) plaintiff's claims are precluded under the doctrine of res judicata and collateral estoppel; (2) plaintiff cannot establish that defendant was deliberately indifferent to any serious medical condition relating to plaintiff's knee, back or mental health treatment; (3) plaintiff cannot demonstrate defendant's personal involvement in medical decisions concerning plaintiff's emergency medical treatment in 2003 for herniated discs; (4) plaintiff's claim of mistreatment of a back injury in 2003 is precluded by the statute of limitations; and (5) Dr. Weitz is entitled to qualified immunity. (Dkt. No. 70).  Defendants Hazzard, Marsh, Grippin, Mace, Howland, Cronk and the County of Schoharie move for summary judgment arguing: (1) plaintiff did not suffer from a serious medical need with respect to his knee, back and mental health and even assuming plaintiff suffered from serious medical need(s), defendants were not deliberately indifferent to plaintiff's condition(s); (2) plaintiff was not denied the ability to freely exercise his religious beliefs; (3) plaintiff was not denied equal protection on account of his religious beliefs; (4) plaintiff was not denied meaningful access to the courts; (6) defendants were not personally involved in the alleged constitutional deprivations; and (7) defendants are entitled to qualified immunity . (Dkt. No. 71). Plaintiff opposes the motions. (Dkt. No. 77).

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit

under the governing law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986).

Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in

dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine

issue of material fact to be decided.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

With respect to any issue on which the moving party does not bear the burden of proof, it may

meet its burden on summary judgment by showing that there is an absence of evidence to support

the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the

nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R.

Civ. P. 56(e).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material

Facts ("Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as

true to the extent that those facts are supported by the evidence in the record.  *See Vermont Teddy*

*Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243 (2d Cir. 2004) (holding that the court

may not rely solely on the movant's statement of undisputed facts contained in its Rule 56.1

statement and must be satisfied that the movant's assertions are supported by the evidence in the

record).  Although a plaintiff is *pro se*, bald assertions, unsupported by evidence, are insufficient

to overcome a motion for summary judgment.  *See Higgins v. Davis*, 2001 WL 262930, at *2

(S.D.N.Y. 2001).

"Defendants can meet their burden of establishing their entitlement to motion for

summary judgment by relying on plaintiff's medical records to establish the absence of any

evidence supporting deliberate indifference to his mental health needs."  *Mills v. Luplow*, 2009

WL 2579195, at *8 (W.D.N.Y. 2009).  Though conventional wisdom might dictate the

submission of affidavits from the primary actors . . . [the] defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's claims, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims." *Id.*

## II.    Collateral Estoppel/Res Judicata

Defendant Weitz seeks dismissal of plaintiff's claims based upon res judicata arguing that plaintiff should be precluded from "splitting" his claims into separate actions when he had, "a full and fair opportunity to litigate his claims in the previous lawsuit".[20]

Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits in an action "precludes the parties or their privies from relitigating issues that were or could have been raised in that action". *Computer Assoc. Int'l v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997). "It must first be determined that the second suit involves the same 'claim' or 'nucleus of operative fact' as the first suit". *Interoceanica v. Sound Pilots, Inc*., 107 F.3d 86, 90 (2d Cir. 1997) (citation omitted).   New York law follows a transactional approach which bars the relitigation of not only matters that were litigated between parties in a preceding action, but also any matters that could have been litigated in that action. *Ramsey v. Busch*, 19 F.Supp.2d 73, 83 (W.D.N.Y. 1998).  To ascertain whether the two actions arise from the same claim, courts look to whether the underlying facts are "related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations". *Interoceanica*, 107 F.3d at 90 (citations omitted).  A plaintiff cannot avoid claim preclusion by " 'splitting' his claim into various suits based on different legal theories (with different evidence

---

[20] Plaintiff does not respond to this argument.

'necessary' to each suit)". *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 110 (2d Cir. 2000)

(citing *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 39 (2d Cir. 1992)).

"As a matter of logic, when the second action concerns a transaction occurring after the

commencement of the prior litigation, claim preclusion generally does not come into play."

*Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) (citing *S.E.C. v. First Jersey*

*Secs.*, 101 F.3d 1450, 1464 (2d Cir. 1996)); *see also Waldman*, 207 F.3d at 113 (res judicata will

not bar a suit based upon legally significant acts occurring after the filing of a prior suit that was

itself based on earlier acts). "Claims arising after the prior action need not, and often perhaps

could not, have been brought in that action and are not barred by res judicata unless they

represent a continuance of the same 'course of conduct'". *Stewart v. Transport Workers Union of*

*Greater New York, Local 100*, 561 F.Supp.2d 429, 443 (S.D.N.Y. 2008) (citing *Green v. Illinois*

*Dep't of Transp.*, 609 F.Supp. 1021, 1026 (N.D. Ill. 1985)) (the court declined to read the doctrine

of res judicata to require the plaintiff to amend his first complaint to allege a claim that arose after

the suit had been filed).  A party may file a supplemental pleading but it not required to do so and

may file a new suit if he chooses.  *Garcia v. Scoppetta*, 289 F.Supp.2d 343, 350 (E.D.N.Y. 2003).

In *Maharaj,* the Second Circuit held:

> If, after the first suit is underway, a defendant engages in actionable
> conduct, plaintiff may-but is not required to-file a supplemental
> pleading setting forth defendant's subsequent conduct. Plaintiff's
> failure to supplement the pleadings of his already commenced lawsuit
> will not result in a res judicata bar when he alleges defendant's later
> conduct as a cause of action in a second suit.

*Maharaj*, 128 F.3d at 97.

Res judicata, if applied too rigidly, could work considerable injustice. *Reilly v. Reid*, 45

N.Y.2d 24, 28 (1978) (holding that claim preclusion is tempered by recognition that two or more

different and distinct claims or causes of action may often arise out of a course of dealing between the same parties) (citations omitted).  "A party's choice to litigate two such claims or causes of action separately does not bar his assertion of the second claim or cause of action." *Id*. at 29 (citation omitted).

In May 2005, plaintiff filed his complaint in *Guarneri I* alleging constitutional violations relating to medical care for his shoulder and knee injuries.[21]  On August 14, 2006, while *Guarneri I* was pending, plaintiff filed a complaint in the instant action alleging constitutional violations relating to medical care for his knee, back, neck and mental health issues.  Defendant argues that plaintiff is attempting to "split" his claims and that he "could have raised the claims at issue here in the previous action".  Defendant contends that "most of the complaints and treatment relating to [plaintiff's] back and mental health complaints occurred in 2004, the same period of time at issue in his previous lawsuit".

It is undisputed that a final judgment on the merits was entered in *Guarneri I*.  However, in *Guarneri I*, plaintiff did not allege any violations with respect to his back, neck or mental health issues.  Applying the "transactional"approach for res judicata purposes, the Court finds that the claims and factual circumstances in the present action pertain to a different time period and are not sufficiently related in time, space and origin.   In both actions, plaintiff alleged constitutional violations relating to medical treatment for his knee.  However, plaintiff was examined by Dr. Weitz in June 2006 and the "give way" incident occurred in July 2006.  Thus, these "legally significant" acts occurred after the complaint was filed in *Guarneri I* and are not precluded under res judicata.  Defendants argue that when plaintiff testified at his deposition in

---

[21] Plaintiff has made no claims with regard to his shoulder in this action.

*Guarneri I*, the medical treatment about which plaintiff complained in the instant action had already occurred.  While the record supports that assertion, the appropriate analysis involves the date of the filing of the first complaint, not the date of the deposition.  Based upon the record before the Court in *Guarneri I* and the record in the present action, the factual scenarios and evidence relevant to *Guarneri I* and the present action are sufficiently different such that a judgment in the present action will not destroy or impair the rights or interests established in *Guarneri I.  See Ramsey v. Coughlin*, 94 F.3d 71, 83 (2d Cir. 1996).  Accordingly, Weitz's motion for summary judgment and dismissal of plaintiff's claims based upon res judicata is denied.

## III.    Eighth Amendment

Defendants claim that they are entitled to summary judgment and dismissal of plaintiff's § 1983 claims because plaintiff cannot demonstrate that any defendant was deliberately indifferent to any serious medical need.

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."[22]  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while

_____

[22] Plaintiff claims that he was a pretrial detainee and enjoyed greater privileges than a convicted prisoner.  However, plaintiff offers no support for this allegation.  "As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences." *McQueen v. County of Albany*, 2010 WL 338081, at *10 (N.D.N.Y. 2010) (citing *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003)). However, the Second Circuit has held that, "[c]laims for deliberate indifference to a serious medical condition of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).

the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). A medical condition is considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). If unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F.Supp.2d 303, 310 (S.D.N.Y. 2001) (citing *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)). "Because there is no distinct litmus test, a serious medical condition is determined by factors such as '(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain.' " *Whitcomb v. Todd*,  2008 WL 4104455, at *10 (N.D.N.Y. 2008) (citing *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Sonds*, 151 F.Supp.2d at 310 (citing *Estelle*, 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id*. In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to

21

the inmate's health or safety.  *Sonds,* 151 F.Supp.2d at 310 (citing *Chance*, 143 F.3d at 702).  The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference.  *Jones v. Lindblad*, 2009 WL 804155, at *6 (W.D.N.Y. 2009) (citing *Estelle*, 429 U.S. at 104).  Culpable intent requires the inmate to establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id*. (citing *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996)).  Delays must be purposeful or intended or the plaintiff must establish that the deprivation of not having treatment in the stated period was sufficiently serious.  *Woods v. Goord*, 1998 WL 740782, at *12 (S.D.N.Y. 1998).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds*, 151 F. Supp. 2d at 311.  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Id.*  An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  The fact that a plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id; see also Whitcomb*, 2009 WL 4104455, at *10 (noting that disagreements over medications, diagnostic techniques (e.g., the need for x-rays), forms of treatment or the need for specialists are not adequate grounds for a §1983 claim).  Even if medical judgments amount to negligence or malpractice, malpractice

22

does not become a constitutional violation simply because the plaintiff is an inmate. *Dean,* 804 F.2d at 215.

### A.    Knee Injury

Defendants argue that plaintiff did not suffer from a serious knee injury and further, that plaintiff received prompt medical attention after the "give way" episode in his cell. Plaintiff claims that the "give way" episode occurred at 2:00 a.m. and that he did not receive medical treatment until five hours later. Plaintiff alleges that defendants deliberately and intentionally denied plaintiff emergency medical care after the episode.

### 1.    Serious Medical Need

A plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *Lowman v. Perlman,* 2008 WL 4104554, at *5 (N.D.N.Y. 2008) (citing *Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y. 2006)). Generally, "knee injuries have been [held] insufficient to trigger Eighth Amendment protection". *Johnson v. Wright*, 477 F.Supp.2d 572, 575 (W.D.N.Y. 2007) (holding that a prisoner's torn meniscus suffered in a basketball injury was not a serious medical need) (quoting *Moody v. Pickles*, 2006 WL 2645124, at *6 (N.D.N.Y. 2006)) (holding that a "medial meniscal tear, with joint effusion" which did not render the plaintiff immobile was not a serious medical need); *see also Williamson,* 2006 WL 1977438, at *9-16 (knee injuries such as a torn meniscus, arthritis, degenerative joint disease and ligament tears are not serious injuries under the Eighth Amendment).

In this matter, plaintiff alleges that he suffers from severe pain and torn ligaments in his knee. Plaintiff's claim that he suffers from an ACL tear is supported by Dr. Friedman's diagnosis. However, in *Guarneri I*, Magistrate Judge Homer concluded that, "the allegations of

pain and chronic ACL tear do not constitute a serious medical need in these circumstances". The record in *Guarneri I* included medical records from 2004 through 2005. In the instant action, plaintiff has not produced any additional evidence demonstrating that he suffers from a serious medical condition with respect to his knee. Plaintiff never exhibited any limitations in his range of motion and never complained of an inability to ambulate. Indeed, plaintiff continued to played basketball even after he was advised, on more than one occasion, by medical staff to avoid outdoor recreation. *See Price v. Engert*, 589 F.Supp.2d 240, 245-46 (W.D.N.Y. 2008) (citing *Chatin v. Artuz*, 28 F.App'x. 9, 10 (2d Cir. 2001)) (two weeks after receiving alleged injuries, the plaintiff was able to play basketball, suggesting that he was not in serious pain and that his injuries did not interfere with his daily activities); *see also Lowman*, 2008 WL 4104554, at *5 (the fact that the plaintiff was able to walk and play basketball suggested that the plaintiff did not suffer from a serious medical need). Plaintiff's claim that he suffered from "severe pain" as a result of his knee injury is contradicted by the medical records wherein plaintiff exhibited a "normal gait" and "no swelling or difficulty walking".

On July 21, 2006, the "give-way" episode occurred in plaintiff's cell. Plaintiff was evaluated by a nurse practitioner who noted that plaintiff ambulated without a limp and found minimal swelling in the knee with tenderness upon palpation. Plaintiff testified that he was in severe pain prior to being treated in the emergency room but that after he received an injection of pain medication, he was "feeling no pain". Indeed, within an hour or two of his return to SCJ, plaintiff had a physical altercation with Correction Officers and kicked "multiple sealed doors off the hinges". Thus, even assuming plaintiff suffered extreme pain after the "give way" episode, such a short period of pain is de minimis and does not constitute a serious medical condition

24

under the Eighth Amendment.  The medical evidence pertaining to plaintiff's knee

injury/complaints fails to establish that plaintiff suffered from a serious or urgent medical

condition.  Plaintiff failed to provide any medical evidence, either with affidavits or medical

records, that defendants' failure to provide treatment caused serious harm.

### 2.        Deliberate Indifference

Even assuming plaintiff had a "serious medical need", plaintiff cannot establish that

defendants were deliberately indifferent.  This court has carefully outlined the extensive attention

that plaintiff received for his complaints.  From January 2004 until August 2006, plaintiff was

examined and/or treated by the medical staff at SCJ or outside medical personnel approximately

thirty times.  In addition, after plaintiff made a request for a knee brace, Dr. Weitz arranged for an

orthopedic consultation with Dr. Friedman.  During the relevant time period, plaintiff had three

appointments with Dr. Friedman - including an appointment three days after the "give way"

episode.  Plaintiff's complaints were never ignored, and in most instances, plaintiff only waited a

few days to see medical personnel.

Plaintiff's complaints of deliberate indifference are also contradicted by the fact that he

received several prescription medications including Bextra, Flexeril and Motrin for knee pain.

According to the record, plaintiff was non-compliant and refused to take the medications claiming

that they "masked his symptoms".  Plaintiff's history of refusing to comply with the directions of

the medical staff and physicians undermines his claims of deliberate indifference. *See Wright v.*

*Genovese*, 2010 WL 890962, at *15 (N.D.N.Y. 2010) (citing *Jones v. Smith*, 784 F.2d 149, 151-

52 (2d Cir. 1986)).  In addition to medication, during his incarceration in 2004, the medical staff

also offered plaintiff support for his knee including a neoprene brace.  Plaintiff refused to wear

the brace.  Upon his arrival at SCJ in June 2006, plaintiff presented with an "old knee brace" and was provided with a new knee brace on the same day.

Plaintiff claims that his requests for physical therapy and injections were intentionally denied.  Based upon the record, the medical staff deemed the requests "not medically necessary" as plaintiff did not exhibit objective signs of a serious injury.  The fact that plaintiff disagreed with the course of treatment does not rise to a level of deliberate indifference and provides no basis for relief under § 1983.

Even crediting plaintiff's claim that he waited five hours for medical care after the "give way" episode, the timing of these events does not establish a disregard of a risk to plaintiff or "deliberate indifference" to his medical needs. *Shankle v. Andreone*, 2009 WL 3111761, at *6 (E.D.N.Y. 2009) (citations omitted).  Although the record contains conflicting accounts with regard to how quickly the medical staff responded to plaintiff's needs, by his own admission, plaintiff was treated within five hours of the incident.  Courts have held that delays longer than five hours were insufficient to implicate the Eighth Amendments.  *See Rodriguez v. Mercado*, 2002 WL 1997885, at *9 (S.D.N.Y. 2002) (the plaintiff was seen within eight or nine hours of the incident); *see also Davidson v. Harris*, 960 F.Supp. 644, 648 (W.D.N.Y. 1997) (holding that even assuming that the plaintiff's factual allegations were true and that he was forced to wait six to eight hours before receiving oxygen and pain medication, the plaintiff has failed to demonstrate that the alleged deprivation was "a condition of urgency, one that may produce death, degeneration or extreme pain", and therefore, failed to state a cause of action of deliberate indifference to serious medical needs).

Plaintiff's conclusory assertions that he received improper medical attention, absent other

26

documentation, fails to constitute evidence sufficient to raise issues of fact to defeat summary

judgment.  *See Williams v. Coughlin*, 650 F.Supp. 955, 957 (S.D.N.Y. 1997) (granting summary

judgment where "plaintiff's affidavit and deposition . . . [did] not contain facts involving

manifestations of . . . deliberate indifference . . .").  Indeed, plaintiff's complaints are contradicted

by the record which establishes that plaintiff received more than adequate medical care for his

knee complaints.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's

claims that defendants violated his Eighth Amendment rights with regard to his knee injury is

granted.

**B.      Knee Brace**[23]

Defendants argue that they did not interfere with plaintiff's medical treatment when they

confiscated the knee brace provided to plaintiff by SCJ.

Where a "prisoner is receiving appropriate on-going treatment for his condition" and

brings a claim for denial of adequate medical care for an "interruption in treatment," the Second

Circuit has stated that the "serious medical need inquiry can properly take into account the

severity of the temporary deprivation alleged by the prisoner."  *Smith*, 316 F.3d at 186.  Plaintiff

must submit some evidence that a defendant interfered with his prescribed course of treatment

and caused plaintiff to suffer pain.  *See Rosales v. Coughlin*, 10 F.Supp.2d 261, 270 (W.D.N.Y.

1998) (holding that the plaintiff submitted evidence that the defendant's repeatedly took his cane

from him on a number of occasions thereby creating an issue of fact as to whether the defendant

acted with wantonness); *see also Williamson*, 2006 WL 1977438, at *18 (finding that the

---

[23] This Court previously granted Weitz's motion to dismiss plaintiff's claim with regard to the confiscation
of the knee brace due to lack of personal involvement.  (Dkt. Nos. 54, 55).

defendants refusal to renew the plaintiff's permit for crutches did not threaten to produce death, degeneration or extreme pain).  A single, isolated occurrence, might not support an Eighth Amendment claim.  *Id*.

This portion of plaintiff's claim belies his argument that defendants were deliberately indifferent to his knee condition.  Plaintiff concedes that defendants provided him with a hinged knee brace after the "give way" episode in July 2006 and further, that he was permitted to wear the brace until his transfer to ECF in late August 2006.  Under these circumstances, the record does not support a finding of deliberate indifference.  Plaintiff has not provided evidence of any additional adverse effects or injuries stemming from the time he was forced to return the brace to SCJ to the present.  There is no evidence that the deprivation of the hinged knee brace created or had the potential to create serious harm to plaintiff.  Moreover, plaintiff has failed to establish that defendants "maliciously took away" his brace.  *Cf. Hemmings v. Gorczyk*, 134 F.3d 104, 107 (2d Cir. 1998).  According to Mace's affidavit, he confiscated the knee brace upon plaintiff's transfer at the request of Lt. Hazzard.  Plaintiff has failed to establish that Mace acted out of anything other than a reasonable belief that the brace was "SCJ property".   Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's complaint with regard to the confiscation of the knee brace is granted.

### C.     Back Injury

Defendants allege that plaintiff's activities and refusal to take medication or adhere to the recommended course of treatment by his physicians demonstrates that he did not suffer from a serious medical need with regard to his back.  Defendants also claim that they were not deliberately indifferent to his medical needs as plaintiff was prescribed pain medication and

28

muscle relaxants.   Plaintiff alleges that defendants: (1) should have provided him with a back

brace: (2) refused to provide emergency medical care for plaintiff's back injuries in 2000 and

2003[24]; and (3) defendants refused to allow him to obtain treatment with a neurosurgeon[25].

The question of whether persistent back pain rises to a level of constitutional significance

depends upon the circumstances of the particular case presented.  *Williams v. Smith*, 2009 WL

2431948, at *8 (S.D.N.Y. 2009) (although the plaintiff may have difficulty meeting the

seriousness issue at trial, all inferences must be drawn in his favor at the summary judgment

stage).  As this Court stated in the prior Memorandum-Decision and Order:

> Other courts have held that "[s]evere back pain, especially if lasting
> an extended period of time, can amount to a 'serious medical need'
> under the Eighth Amendment." *Nelson v. Rodas*, 2002 WL 31075804,
> at *14 (S.D.N.Y. 2002) (citations omitted); *see also Farraday v.
> Lantz*, 2005 WL 3465846, at *5 (D. Conn. 2005) (holding that
> "persistent[ ] complain[ts] of lower back pain caused by herniated,
> migrated discs [and] sciatica ..." leading to severe pain constitutes a
> serious medical need).

(*See* Dkt. No. 55).

Back pain does not constitute a serious medical need where despite being seen frequently

by prison medical officials, plaintiff "did not voice a significant number of concerns regarding

pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter

medications." *Jackson v. Fairchild*, 2007 U.S. Dist. LEXIS 17497, at *5-9 (N.D.N.Y. 2007) .

Based upon the record, there is an issue of fact with respect to whether plaintiff suffered

from a serious back injury.  Dr. Weitz noted that plaintiff complained of back pain "since his

---

[24] This Court previously determined that any allegations from 2000 were barred by the applicable statute of limitations.

[25] The allegations with regard to the neurosurgeon are not contained in the Second Amended Complaint. Rather, plaintiff raised the issue for the first time in his opposition to defendants' motions.

arrival to jail".  Plaintiff continued to complain of back pain throughout 2004 and underwent x-rays in June 2004 which revealed mild degenerative changes in the lower spine.  Conversely, the record indicates that plaintiff was prescribed Tylenol, Bextra and Flexeril for his pain but that he was not compliant with his medication and disobeyed doctor's orders by playing basketball.

Even assuming plaintiff suffered from a serious medical need, plaintiff has not submitted competent evidence demonstrating that defendants were deliberately indifferent and disregarded his health or safety.  As noted previously, plaintiff's request for medical treatment were routinely granted and in most cases, within 2 days of such requests.  Plaintiff was evaluated by an orthopedic specialist, was prescribed several medications for his back pain and underwent x-rays of his back at an outside facility at Dr. Weitz's request.  Accordingly, plaintiff cannot establish that defendants were deliberately indifferent to his medical needs.

Plaintiff alleges that defendants ignored his requests for a back brace and refused to allow him to consult with a neurosurgeon based upon non-medical concerns.  Upon a review of the record, it is clear that plaintiff's requests were denied due to plaintiff's refusal to adhere to the medical staff's prescribed course of action and his unwillingness to accept medication for his complaints of pain.  The record establishes that defendants were responsive to plaintiff's request but did not provide plaintiff with the specific treatment he requested.  Plaintiff was provided with muscle relaxants and other prescription medication.  Plaintiff clearly disagreed with defendants course of treatment. However a disagreement, without further evidence, is insufficient to sustain a cause of action for violations of plaintiff's Eighth Amendment right.  Plaintiff was treated by a number of different medical professionals who are afforded wide discretion in their treatment of prisoners. *See Aquino v. Kooi*, 2007 WL 201169, at *4 (N.D.N.Y. 2007).

30

Finally, plaintiff claims that defendants' deliberately refused to provide "emergency care" in 2003 after a slip and fall in the shower area and assault by another inmate at the SCJ.[26]  As a result of the incident(s), plaintiff claims that he sustained herniated discs in his neck and lower back.  Plaintiff has not provided any competent, admissible evidence to support that allegation.  Indeed, the record does not contain any evidence or medical records relating to any of plaintiff's medical treatment in 2003 either within or outside of SCJ.  The record is also devoid of any medical requests for treatment or any other complaints by plaintiff of pain in his neck.

Dr. Weitz argues that he is entitled summary judgment and dismissal of plaintiff's claims relating to the denial of "emergency care" 2003 because he did not begin treating plaintiff until January 2004.  The record establishes that Dr. Weitz did not treat plaintiff until January 2004 and plaintiff does not dispute this contention.  Accordingly, summary judgment and dismissal of this cause of action as against Dr. Weitz is appropriate on this basis as well.[27]

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claim that defendants were deliberately indifferent to his medical needs for back and neck injuries is granted.

### D.     Mental Health

Defendants argue that plaintiff did not suffer from a serious mental health condition.  Further, defendants claim that plaintiff cannot establish that they were deliberately indifferent to

---

[26] From a review of the complaint, the Court is unable to determine which event occurred in 2000 and which occurred in 2003.  The Court has already determined that plaintiff's claims with respect to any injury in 2000 are precluded by the statute of limitations.

[27] The Court has determined that Weitz was not personally involved in plaintiff's complaints of inadequate emergency care in 2003.  Thus, the Court declines to engage in an analysis of Weitz remaining argument that any cause of action arising from the 2003 injury is barred by the statute of limitations.

his medical needs as defendant responded to plaintiff's requests for mental health treatment and

plaintiff never filed any grievance with respect to the issue.  Plaintiff claims that he suffers from

mental illness and that the, "psychiatric care he received can be such a substantial deviation from

accepted standard as to constitute deliberate indifference".  Plaintiff claims he was denied

supportive therapy and follow up interviews with mental health providers.

The denial of mental health care may constitute a violation of the Eighth Amendment if

plaintiff alleges "pain, discomfort or risk to health".  *Mills*, 2009 WL 2606240, at *16 (citation

omitted).  Support for the claim of mental illness may be presented in the form of "medical

evidence, such as a physician's diagnosis." *Selah v. N.Y.S. Docs Com'r*.  2006 WL 2051402, at *5

(S.D.N.Y. 2006) (citing *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir.1995)).  Plaintiff must

provide evidence that a condition is of urgency.  *See Beckford v. Portuondo*, 151 F.Supp.2d 204,

218 (N.D.N.Y. 2001) (holding that even if the plaintiff's mental health care was "far from

optimum", he was provided significant psychotropic medication, bi-weekly individual therapy

sessions, and monthly medical reviews while incarcerated).  Disagreements with the treatment

offered or allegations that he should have received more time with a psychiatrist do not constitute

deliberate indifference.  *Id*.  Moreover, plaintiff cannot establish a "serious medical need" when

he is offered but refuses medication that may alleviate his mental anguish. *Sims v. Daley*, 1997

WL 33608, at *5 (S.D.N.Y. 1997).

In this case, plaintiff alleges that he suffers from post-traumatic stress disorder, severe

depression, anti-social disorder and bipolar disorder.  Plaintiff presents conclusory allegations and

fails to submit medical records or an affidavit from any physician or mental health provider to

support his assertions.  In fact, plaintiff's allegations are wholly inconsistent with the record.  Dr.

Becker opined that plaintiff did not suffer from PTSD.  Moreover, according to the record, the mental health staff at SCJ and Schoharie Mental Health Clinic continually noted that plaintiff was not a risk to others, not a suicide risk and did not display homicidal ideation.

Even assuming plaintiff could establish that his mental health condition was serious, plaintiff cannot establish that defendants were deliberately indifferent to his condition. When plaintiff began complaining of mental health issues, Dr. Weitz contacted Schoharie Mental Health Clinic and consulted with Kelly Farnum and arranged for an evaluation by Dr. Becker.  The record demonstrates that each time plaintiff requested a mental health evaluation, he was seen and treated within days of the request.  *See Mills* 2009 WL 2606240, at *17 (holding that the record demonstrated that the plaintiff received adequate care for his mental health condition while incarcerated as the plaintiff was seen by the prison's mental health staff each time he requested). In 2004, Dr. Weitz and Dr. Becker prescribed Depakote, Welbutrin and Prozac.  Moreover, within a few days of arriving at SCJ in June 2006, plaintiff received a prescription for Prozac from SCJ's medical staff.   Based upon the record, plaintiff cannot establish that defendants were deliberately indifferent to his mental health needs and therefore, defendants' motions for summary judgment and dismissal of plaintiff's Eighth Amendment claims with respect to his mental health is granted.

**IV.    Plaintiff's Request for a Catholic Priest** [28]

Plaintiff has alleged causes of action under the Religious Freedom Restoration Act ("RFRA") and the First Amendment.[29]  Plaintiff claims that defendants "tried to pass off Rev.

---

[28] This cause of action has not been asserted against Weitz.

[29]  Plaintiff asserted a cause of action pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA"). The RFRA was declared unconstitutional by the Supreme Court in 1997 and was amended by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See Hamilton v. Smith*, 2009 WL 3199531, at *1 (N.D.N.Y. 2009) (citation omitted).  Therefore, the Court construes plaintiff's RFRA claim

Ferenczy as a Catholic Priest" and thus, committed fraud.  Defendants claim that plaintiff was not inhibited from practicing any sincerely held religious belief.

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") (42 U.S.C. § 2000cc-1), imposes duties on prison officials that exceed those imposed by the First Amendment.  *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (citation omitted).  Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion.  *Redd v. Wright*, 2010 WL 774304, at *3 (2d Cir. 2010).  "The state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest. *Id*.

Under the First Amendment, "a generally applicable policy will not violate a plaintiff's right to free exercise of religion if the policy is 'reasonably related to legitimate penological interests' ". *Id*. (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).   To succeed on a claim under the First Amendment, the plaintiff must prove that defendants conduct substantially burdened his sincerely held religious beliefs.  *Pugh v. Goord*, 571 F.Supp.2d 477, 497 (S.D.N.Y. 2008).  The defendant must then establish that legitimate penological interests justify the impinging conduct.  *Id*.

In order to be considered a "substantial burden", the plaintiff must demonstrate that the government's action pressured him to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith.  *Muhammed v. City of New York Dep't of Corrections*, 904 F.Supp. 161, 188 (S.D.N.Y. 2005) (citations omitted). The burden must be more than an inconvenience, it must be substantially interfere with a tenet or

---

as a RLUIPA cause of action.

belief that is central to the religious doctrine.  *Id*. (citations omitted); *see also Jones v. Shabazz*, 2009 WL 3682569, at *2 (5th Cir. 2009) (holding that a government action or regulation only creates a "substantial burden" on a religious exercise if it truly pressures an adherent to significantly modify his religious behavior and significantly violate his religious beliefs).  If the plaintiff demonstrates a substantial burden, the onus shifts to the government to prove that an action or policy is the least restrictive means of furthering a compelling state interest.  *See Pugh*, 571 F.Supp.2d at 503.  A court must consider whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant. *Kikumura v. Hurley*,  242 F.3d 950, 962 (10th Cir. 2001).  Prison security and penological institutional safety goals are unquestionably compelling state interests.  *Muhammed*, 904 F.Supp. at 189.  Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience . . . of prison [] administrators in establishing necessary regulations . . . to maintain security and discipline . . ."  *Jova*, 582 F.3d at 415 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)).

While an inmate has a constitutional right to practice his religion, the prison staff  "is not under an affirmative duty to provide each inmate with the spiritual counselor of his choice". *Davidson v. Davis*, 1995 WL 60732, at *5-6  (S.D.N.Y. 1995) (citing 42 U.S.C. § 2000bb-1(b)); *see also Reimers v. Oregon*, 863 F.2d 630, 632 (9th Cir.1988) (an inmate does not have the right under the Free Exercise Clause to have the particular clergyman of his choice provided to him). The Constitution does not require that a religious advisor be provided for every sect in a penitentiary.  *Weir v. Nix*, 114 F.3d 817, 820 -821 (8th Cir. 1997) (citing *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972)) (prison officials need not provide exactly the same religious facilities or

35

personnel to prisoners of every faith).  A plaintiff cannot demonstrate that his ability to practice his religion is substantially burdened by the requirement that he bear the responsibility for co-ordinating visits with spiritual advisors.  *See Pogue v. Woodford*, 2009 WL 2777768, at *8 (E.D. Cal. 2009) ("[i]f the rule were to the contrary, prisons would have to fund any other religion facilitating request without which an inmate could claim a substantial burden") (citations omitted).  Only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are substantially burdened in this manner. *Id.* (citing *SapaNajin v. Gunter*, 857 F.2d 463, 464 (8th Cir.1988)).

     In the case at hand, defendants do not dispute that plaintiff had sincerely-held religious beliefs.  Accordingly, the Court analyzes whether defendants' conduct created a substantial burden upon those beliefs.  Plaintiff makes the conclusory allegation that defendants attempted to perpetrate a fraud by "passing Rev. Ferenczy off as a Catholic".  However, plaintiff has provided no factual basis for these assertions.  Plaintiff testified that SCJ provided him with a Bible and rosary beads, upon request.   Further, plaintiff admits that he had access to the facility Chaplain, Rev. Ferenczy and testified that he actually met with the Reverend on at least one occasion.  As part of the motion herein, Sgt. Newman provided a copy of the SCJ's Inmate Rules and Regulations which were in effect during plaintiff's incarceration.  The Rules provided, *inter alia*, "[y]ou may request religious assistance.  Every effort will be made to assist you with your request, starting with the Facility Chaplain".  The Rules and Regulations clearly stated that the facility would make "every effort" to honor requests for religious assistance. Moreover, according to the Regulations, SCJ allowed outside clergy to visit.  Defendants have provided evidence that

the SCJ staff attempted to locate a Catholic priest to meet with plaintiff.  Plaintiff has not

submitted any evidence demonstrating that defendants' failure to provide a Catholic priest

pressured him to commit an act forbidden by his faith.  Plaintiff has not demonstrated that he was

"prevented" from meeting with a spiritual advisor of his choice.  Rather, plaintiff argues, without

legal or factual support that defendants are obligated to provide him with such an advisor.

Plaintiff's argument lacks merit.  Defendants' failure to comply with plaintiff's request does not

amount to either a constitutional or statutory violation.   Based upon the record, plaintiff 's free

exercise of religion was not substantially burdened by defendants' failure to provide him with a

Catholic priest.

Even if plaintiff could establish that his rights were substantially burdened, plaintiff's

claim would nonetheless fail because defendants actions were the least restrictive means in

furtherance of a compelling interest.  Construing plaintiff's complaints in a favorable light,

plaintiff seemingly argues that he was denied visits with personal spiritual advisors.  Plaintiff

claims that SCJ personnel told him that Henry Eckerd, a Jehovah's Witness, would not come to

see him.  Plaintiff also claims that he asked to be allowed to see his godfather, a Catholic priest,

but that he wasn't allowed to have visitors.  Plaintiff cannot prevail on this claim for two reasons.

First, according to the SCJ Inmate Rules and Regulations, "[m]eetings with attorneys, counselors

and clergy are not charged as visits".  Plaintiff has not submitted evidence proving that he

contacted his godfather and that defendants explicitly refused to allow visitation.  Further, during

his deposition, plaintiff admitted that he did not call Mr. Eckerd because he did not want to "run

up his phone bill".  Second, even assuming plaintiff was denied visits with clergy, based upon the

record, defendants' had a compelling interest in revoking plaintiff's visitation privileges.

37

Defendants do not dispute that plaintiff's visitation privileges were revoked.  Throughout his deposition, plaintiff admitted that he was prone to violence indicating that he had kicked corrections officers during altercations and that he became, "physical with the staff to see medical".  Plaintiff admitted that he, "assault[ed] the staff" to get them to take him to the medical unit.  Plaintiff stated that this occurred on two or three occasions.  There is no unqualified constitutional right to visitation, which may be regulated in keeping with legitimate penological objectives.  *Smith v. Beatty*, 1996 WL 166270, at *1 (7th Cir. 1996) (citing *Block v. Rutherford*, 468 U.S. 576, 588 (1984)).   Even assuming plaintiff could establish that he was denied the right to visit with clergy, based upon the record, plaintiff's violent outbursts and behavior resulted in the decision to restrict plaintiff's visitation privileges.  Clearly, this  was the least restrictive means of furthering a compelling governmental interest.  Moreover, plaintiff admitted that even before his visitation privileges were revoked, he was not visited by a Catholic priest.

Based upon the record, plaintiff was not deprived of the right to exercise the religion of his choice.  Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's First Amendment claims and RLUIPA claims relating to religion is granted.

## VI.     Fourteenth Amendment - Equal Protection[30]

Plaintiff alleges that, "Lt. Hazzard deliberately and intentionally tried to force a different religion on plaintiff" and denied plaintiff the right to Equal Protection under the Fourteenth Amendment.  Defendants contend that there is no evidence that plaintiff was treated differently on account of his religious beliefs.

"The equal protection clause directs state actors to treat similarly situated people alike."

---

[30] This cause of action has not been asserted against Weitz.

38

*Salahuddin v. Perez*, 2006 WL 266574, at *9 (S.D.N.Y.2006) (citing *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995)).  To prove an equal protection violation, plaintiff "must prove that the decisionmakers in his case acted with discriminatory purpose."  *Id.* (citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987)).  "[T]he Equal Protection Clause does not require that "every religious sect or group within a prison must have identical facilities or personnel".  *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987) (citing *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972)).  Rather, it entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'"  *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008) (quoting *Cruz*, 405 U.S. at 322).

Plaintiff has failed to produce any evidence that defendants intentionally or purposefully discriminated against him on the basis of his faith.  Plaintiff has not provided any evidence of bias, discriminatory remarks or evidence of comparable situations where fellow inmates were treated differently.  Plaintiff's conclusory assertions that defendants committed "fraud" by attempting to "pass off" Rev. Ferenczy as Catholic are unsupported by facts or the record.  Based upon the record, the Court finds that plaintiff has been provided with "reasonable opportunities" to practice his faith and therefore, has not been denied equal protection.  *See Card v. Dugger*, 709 F.Supp. 1098, 1109 (M.D. Fla. 1988).

**VII.    Access to Courts[31]**

Defendants argue that plaintiff was not denied meaningful access to the courts.  Specifically, defendants contend that SCJ maintains a law library that complies with New York State's Minimum Standards and Regulations for Management of County Jails and Penitentiaries

---

[31] This cause of action has not been asserted against Weitz.

and provides all required texts.  Plaintiff claims that defendants impeded his ability to do legal research and that the SCJ law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system.  Further, plaintiff argues that his time in the library was "intentionally and unreasonably limited".

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  *Bounds*, 430 U.S. at 828; *Bourdon*, 386 F.3d at 92.  However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense."  *Lewis v. Casey*, 518 U.S. 343, 351-54 (1996).  The government does not have to afford inmates unlimited access to a library.  *Bounds*, 430 U.S. at 828; *see also Shell v. Brun*, 585 F.Supp.2d 465, 468 (W.D.N.Y. 2008) (holding that a prison law library may not be to an inmate's liking but that does not make it constitutionally inadequate).  The plaintiff must prove that the "alleged shortcomings in the library [] hindered his efforts to pursue a legal claim".  *Davis v. Buffardi*, 2005 WL 1174088, at *1-2 (N.D.N.Y. 2005) (citing *Lewis*, 518 U.S. at 351); *see also Santiago v. James*, 1998 WL 474089, at *4-5 (S.D.N.Y. 1998) (holding that the plaintiff failed to offer specific facts regarding the type of materials requested, who allegedly denied him the materials or when/frequency of these alleged occurrences).

In order to survive a motion for summary judgment, the plaintiff must present evidence

showing that: (1) the defendants acted deliberately and maliciously; and (2) that he has suffered actual injury. *Lewis*, 518 U.S. at 351-54.  Where it is alleged that access to a law library or necessary materials has been denied, plaintiff must establish that the deprivation proximately causes some prejudice or denial of a legal claim.  *Ramsey v. Coughlin*, 1 F.Supp.2d 198, 204-05 (W.D.N.Y. 1998) (citing *Lewis*, 518 U.S. at 351).

If the plaintiff cannot articulate any actual injury as a result of purported efforts by the defendants to prevent him from litigating his case, his access claim can not survive scrutiny. *Odom v. Kerns*, 2002 WL 31059341, at *4 (S.D.N.Y. 2002).  "The underlying action that the plaintiff alleges being denied access to must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope".  *Key v. Fischer*, 2007 WL 2522352, at *4-5 (S.D.N.Y. 2007)  (citing *Christopher v. Harbury*, 536 U.S. 403, 416 (2002)) (holding that the complaint should state the underlying claim in accordance with Fed. R. Civ. P. 8(a)).  A plaintiff must offer specific references to the injury and must demonstrate that he sustained dismissal of or prejudice to a lawsuit because of the lack of law books.  *Gill v. Pact Org.*, 1997 WL 539948, at *4-6 (S.D.N.Y. 1997).  When the plaintiff fails to provide the court with the case number of the habeas petition that was allegedly dismissed due to the defendants' alleged actions, he has failed to demonstrate how he was actually injured or prejudiced by the alleged denial of access to the courts.  *Bolton v. King*,  2008 WL 2952769, at *5 (S.D.Miss. 2008); *see also Smith v. Henderson*, 2007 WL 142765, at *4 (S.D.Ga. 2007) (holding that the plaintiff failed to establish a genuine issue of fact regarding whether he suffered an actual injury as the plaintiff was not specific about his previous case).

Based upon the record, plaintiff has failed to show that a reasonable factfinder could

41

conclude that his access to the courts was caused by defendants' deliberate misconduct. Conversely, the record demonstrates that plaintiff was routinely given extended library time and that his requests for addresses, pens, notebooks and a notary were all approved.  Plaintiff admittedly has filed a multitude of lawsuits and testified that he filed four lawsuits while incarcerated at SCJ including an Article 78 petition filed on April 7, 2004.  *See Hopper v. John Doe Myers Recreational Coach Northwest Detention Center*, 2006 WL 3337388, at *5 (W.D.Wash. 2006) (holding that the numerous civil suits, pleadings, and motions the plaintiff was able to successfully bring and vigorously prosecute in District Court, showed that he had sufficient access to the courts while detained).

Even assuming that defendants intentionally denied plaintiff access to the library and legal materials, plaintiff has not submitted evidence that he sustained any actual injury. Specifically, plaintiff testified that he was denied access to Article 78 documents and that he was prevented from filing a writ of habeas corpus.  However, when plaintiff was asked about missing deadlines for filing papers due to the inadequacy of the library, plaintiff could not recall the deadline dates. Plaintiff could only state that his "divorce, my visitation and [] a couple Article 78s against the defendants" were dismissed based upon the fact that the complaints were insufficiently drafted. Plaintiff failed to provide any details about his Article 78 submissions or habeas petition other than the fact that he made such a petition.  *See Waters,* 2009 WL 750217, at *5; *see also Swift v. Tweddell*, 2008 WL 4615053, at *9 (W.D.N.Y. 2008) (holding that the plaintiff failed to identify any judicial proceeding that the plaintiff attempted to pursue that was hindered by the alleged deficiencies of the law library).  Plaintiff has failed to offer any evidence establishing that the alleged deficiencies in the SCJ law library impeded his efforts to bring a viable legal claim.

Plaintiff has not produced copies of petitions or lawsuits that were allegedly dismissed nor has plaintiff provided case numbers for these alleged submissions.  Plaintiff has failed to submit evidence that the dismissal of any cause of action was proximately caused by his alleged denial of access to the courts.  Based upon the lack of evidence, plaintiff has not established that his underlying Article 78 filing(s) or habeas petition(s) were nonfrivolous.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's cause of action alleging that his First Amendment right to access to the courts was violated is granted.

## VIII.   Personal Involvement

Defendants Cronk, Marsh, Grippin, Howland and Mace move for summary judgment arguing that they were not personally involved in the alleged constitutional violations.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior ) is insufficient to show his or her personal involvement in that unlawful conduct.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981).  In other words, supervisory officials may not be held liable merely because they held a position of authority.  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).  Rather, supervisory personnel may be considered

43

"personally involved" only if they:  (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 973 (2d Cir. 1995).

"In order to defeat the portion of [the] defendants' motion for summary judgment asserting lack of personal involvement, it was incumbent upon [the] plaintiff to present evidence to support an inference that the defendants implicated in that motion had personal involvement in any deliberate indifference to his medical care." *Mendoza v. McGinnis*, 2008 WL 4239760, at *8 (N.D.N.Y. 2008) (citations omitted).  Personal involvement is generally a question of fact and summary judgment may be granted only where the defendant establishes that no issues of material fact exist such that the defendant is entitled to summary judgment as a matter of law. *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citing Fed.R.Civ.P. 56(c) and cases)).

In the complaint, plaintiff referred only once to Cpl. Cronk claiming that he deliberately denied plaintiff appropriate mental health care by not allowing plaintiff speak to mental health counselors when having mental health episodes.  Plaintiff failed to offer any evidence with regard to Cpl. Cronk's alleged involvement in his mental health care or such "episodes".  Indeed, plaintiff testified that Cpl. Cronk was "one step of supervision before a sergeant" and that he improperly reacted to plaintiff's mental health crisis.  The fact that Cpl. Cronk may have had some supervisory authority is insufficient to create liability under § 1983.  Plaintiff has failed to submit any proof demonstrating that Cpl. Cronk was personally involved in any of his alleged

constitutional violations.  Accordingly, the Court grants Cronk's motion for summary judgment and dismissal of plaintiff's complaint for lack of personal involvement, in addition to the reasons that the Court has previously discussed.

With respect to the remaining defendants, plaintiff has provided sufficient evidence to raise a triable issue of fact with regard to defendants involvement in the alleged constitutional violations.  Plaintiff testified that Deputy Howland and Deputy Grippin refused to communicate his medical needs to the medical staff.  Defendant Howland failed to submit an affidavit setting forth facts that would be admissible into evidence.  *See Davis v. Goode*, 995 F.Supp. 82, 91 (E.D.N.Y. 1998) (holding that the defendants failed to carry their burden of presenting affidavits or other evidence to support their claim that no material issues of fact exist as to the personal involvement of these individual defendants).  Thus, Howland has failed to sustain his burden on a motion for summary judgment on this issue.

Defendants Grippin and Mace provided affidavits admitting that they were employed at SCJ at the relevant time.  Although Grippin and Mace deny any wrongdoing in the matter, there are triable issues of fact regarding Grippin and Mace's personal involvement in plaintiff's alleged constitutional violations.

Finally, plaintiff alleges that Deputy Paul Marsh denied him adequate emergency medical care after an incident that occurred at SCJ in 2003.   On the motion, Marsh provided an affidavit and stated that he was injured on the job on November 7, 2005 and did not return to work.  Deputy Marsh does not deny that he was working at SCJ prior to November 2005. Therefore, plaintiff has sufficiently alleged personal involvement as against Deputy Marsh.  Thus, the Court denies Marsh's motion for summary judgment on this basis.

## IX.    Qualified Immunity

Public officials enjoy qualified immunity from liability under § 1983 "so long as their

conduct does not violate a clearly established statutory or constitutional right."  *Richardson v.*

*Selsky*, 5 F.3d 616, 621 (2d Cir. 1993) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19

(1982)).  The Second Circuit has held that "[a] right is clearly established if:  (1) the law is

defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the

right; and (3) 'a reasonable defendant [would] have understood from the existing law that [his]

conduct was unlawful.'"  *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Anderson v.*

*Recore*, 317 F.3d 194, 197 (2d Cir. 2003)).

In determining whether qualified immunity applies, the Court may first consider whether

"the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*,

533 U.S. 194, 201 (2001), modified by *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 818

(2009) (holding that although "the sequence set forth [in *Saucier*] is often appropriate, it should

no longer be regarded as mandatory").  If the plaintiff establishes that the violation of a

constitutional right occurred, the court can examine "whether the right was clearly established . . .

in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S.

at 201.  "If no constitutional right would have been violated were the allegations established,

there is no necessity for further inquiries concerning qualified immunity."  *Id.*

Inasmuch as this Court finds that plaintiff has failed to prove any constitutional violation,

defendants are entitled to summary judgment on this ground.  *Dorcely v. Wyandanch Union Free*

*Sch. Dist.*, 665 F.Supp.2d 178, 219 (E.D.N.Y. 2009) (citing *The Cathedral Church of the*

*Intercessor v. The Inc. Vill. of Malverne*, 353 F.Supp.2d 375, 391 (E.D.N.Y. 2005)) ("[w]ithout

an underlying constitutional violation, qualified immunity cannot attach").

**CONCLUSION**

To summarize, the Court denies defendant Weitz's motion for summary judgment on the basis of res judicata. Weitz's motion for summary judgment and dismissal of plaintiff's Eighth Amendment claims relating to plaintiff's knee, back and mental health is granted as plaintiff has failed to establish that Weitz was deliberately indifferent to any serious medical need. Moreover, Weitz's motion for summary judgment and dismissal of plaintiff's claim that Weitz deliberately and wilfully denied "emergency care" for plaintiff's back injury in 2003 is granted based upon Weitz's lack of involvement. Accordingly, plaintiff's complaint as against defendant Weitz is dismissed in its entirety and Weitz is awarded summary judgment.

Defendant Cronk's motion for summary judgment and dismissal of plaintiff's Eighth Amendment, First Amendment and Fourteenth Amendment claims based upon lack of personal involvement is granted.[32]

Defendants Hazzard, Marsh, Grippin, Howland, and Mace motions for summary judgment and dismissal of plaintiff's Eighth Amendment causes of action are granted as plaintiff has failed to establish that defendants were deliberately indifferent to any serious medical need. Defendants motions for summary judgment and dismissal of plaintiff's First Amendment right to free exercise of religion are granted as plaintiff has failed to establish that defendants prevented him from engaging in religious activities without any reasonably related penological interest. Defendants motions for summary judgment and dismissal of plaintiff's Fourteenth Amendment Equal Protection cause of action is granted as plaintiff has failed to submit evidence that defendants

---

[32] In the alternative, Cronk's motion for summary judgment is also granted for the reasons discussed in the context of defendants Hazzard, Marsh, Grippin, Howland and Mace's motions for summary judgment.

intentionally discriminated against plaintiff on the basis of his faith.  Defendants motions for summary judgment and dismissal of plaintiff's First Amendment access to courts cause of action is granted as plaintiff has failed to demonstrate that defendants intentionally deprived him of access to courts and further, that he sustained an actual injury as a result of such denial.

In the alternative, all defendants are entitled to summary judgment and dismissal of plaintiff's complaint, in its entirety, based upon qualified immunity.

**Accordingly, it is hereby**

**ORDERED**, that defendant Weitz's motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 70) is **GRANTED**, and it is further;

**ORDERED**, that defendants Hazzard, Marsh, Grippin, Howland, Mace and County of Schoharie's motions for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 71) are **GRANTED**, and it is further;

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order upon the parties by regular or electronic mail, and it is further;

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral to a Magistrate Judge has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

Date:  March 22, 2010

_____
Norman A. Mordue
Chief United States District Court Judge

48